**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

NATALIE KANTOR,

     Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO,
BRIAN LONG, in his individual capacity,
WILLIAM BARTZ, in his individual capacity,
THOMAS BRYSON, in his individual capacity,
CLAIRE SMITH, in his individual capacity,
NICHOLAS CIARDULLO, in his individual capacity,

     Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Natalie Kantor, by and through her attorneys, Andy McNulty and Mari Newman of KILLMER, LANE & NEWMAN, LLP, respectfully alleges for her Complaint and Jury Demand as follows:

## INTRODUCTION

1.    Yet again, the Denver Police Department has violated the Constitution by retaliating against a civilian for simply exercising her constitutional rights. Plaintiff Natalie Kantor was arrested, taken to the ground, jailed, and criminally prosecuted for almost two years by Defendants simply because she protested and filmed the unlawful arrest of her friend from a public sidewalk in downtown Denver, Colorado. This is far from the first time that Denver's police officers have retaliated against those who criticize and film them, and as it has in the past, Denver has failed to hold accountable those officers who have blatantly violated the

1

Constitution. Ms. Kantor brings this lawsuit with the hope that Defendants might face some accountability for their actions, and Denver will cease to tolerate its officers' blatant flouting of civilians' constitutional rights.

## PARTIES

2.      At all times relevant to this Complaint, Plaintiff Natalie Kantor was a citizen of the United States of America and a resident of and domiciled in the State of Colorado

3.      At all times relevant to this Complaint, Defendant City and County of Denver, Colorado ("Denver") was a Colorado municipal corporation.

4.      At all times relevant to this Complaint, Defendant Brian Long was a citizen of the United States and resident of and domiciled in the State of Colorado. At all relevant times, Defendant Long was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for Denver.

5.      At all times relevant to this Complaint, Defendant William Bartz was a citizen of the United States and resident of and domiciled in the State of Colorado. At all relevant times, Defendant Bartz was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for Denver.

6.      At all times relevant to this Complaint, Defendant Thomas Bryson was a citizen of the United States and resident of and domiciled in the State of Colorado. At all relevant times, Defendant Bryson was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for Denver.

7.      At all times relevant to this Complaint, Defendant Claire Smith was a citizen of the United States and resident of and domiciled in the State of Colorado. At all relevant times,

Defendant Smith was acting within the scope of her official duties and employment and under color of state law in her capacity as a law enforcement officer for Denver.

8.      At all times relevant to this Complaint, Defendant Nicholas Ciardullo was a citizen of the United States and resident of and domiciled in the State of Colorado. At all relevant times, Defendant Ciardullo was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for Denver.

9.      Defendants Long, Bartz, Bryson, Smith and Ciardullo are referred to collectively herein as the "Individual Defendants".

## JURISDICTION AND VENUE

10.      This action arises under the Constitution and laws of the United States, and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

11.      Venue is proper in this District according to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in this District and all Defendants reside in this District.

## FACTUAL ALLEGATIONS

12.      In the early morning of July 15, 2019, Plaintiff Natalie Kantor was with a friend and riding in his truck as they drove to his apartment.

13.      As Ms. Kantor's friend drove down Cherokee Street and passed 12th Avenue in downtown Denver, Denver police officer Defendant Brian Long pulled up behind them and turned on his emergency lights.

14.      Ms. Kantor's friend immediately pulled over the vehicle.

15.     When Defendant Long approached the vehicle, he informed Ms. Kantor's friend that he had pulled them over because the tailgate of his truck was obstructing his license plate. Defendant Long asked Ms. Kantor's friend to step out of the truck to look at the license plate, and he did so.

16.     In the interim, Defendant Nicholas Ciardullo arrived on-scene in a separate police cruiser.

17.     Defendant Long then put Ms. Kantor's friend through a battery of field sobriety tests.

18.     Ms. Kantor's friend has a number of disabilities associated with his career as a professional snowboarder, including having suffered numerous traumatic brain injuries, knee issues, and shoulder issues. Ms. Kantor's friend told Defendant Long about these disabilities prior to his use of numerous field sobriety tests, letting Defendant Long know that his disabilities might hinder his ability to perform some of the tests even though he was sober. Because of the manifestations of his disabilities, Ms. Kantor's friend failed a few field sobriety tests as he had predicted he would; however, he passed those tests which he could perform without any issues due to his disabilities.

19.     Despite the fact that Ms. Kantor's friend had clearly passed those field sobriety tests that his disabilities did not prevent him from performing, Defendant Long decided to arrest him. A jury would later acquit Ms. Kantor's friend of all of the bogus charges levied against him by Defendants, including driving while intoxicated.

20.     Ms. Kantor's friend had been completely cooperative with the officers and showed no indication that he would be anything but cooperative, yet Defendant Long decided to trick Ms. Kantor's friend and arrest him without warning. Defendant Long told Ms. Kantor's

friend to clap his hands behind his back, as a ruse that it was just another field sobriety test, and then grabbed his arms and began to place him into handcuffs. Ms. Kantor's friend, confused, pulled his arms back and asked Defendant Long why he was being placed under arrest. In response, Defendant Long and Defendant Ciardullo tackled Ms. Kantor's friend to the ground and piled on top of him. Defendants Long and Ciardullo pinned Ms. Kantor's friend to the ground just behind the rear bumper of his truck.

21.     Ms. Kantor was still sitting in her friend's truck. After hearing the struggle, Ms. Kantor got out and walked around the passenger side of the truck on the sidewalk.

22.     When Ms. Kantor reached the back bumper of the truck, she saw her friend underneath the officers. Ms. Kantor was confused as to what was happening and began asking the officers why they were arresting her friend.

23.     Ms. Kantor remained on the sidewalk throughout the entirety of the interaction. She was more than eight feet from the officers at all times.

24.     At that point, Ms. Kantor's friend was yelling out "just let me breathe" as the two officers put their entire body weight on top of him.

25.     Ms. Kantor, sensing that the police were mistreating her friend, pulled out her phone and began to film Defendants Long's and Ciardullo's wrongful arrest and use of excessive force against her friend.

26.     In repose to seeing her filming and hearing her protestations of their arrest, Defendants Long and Ciardullo yelled at Ms. Kantor and told her to back up. Even though Ms. Kantor was at a reasonable distance and in no way interfering with Defendants Long and Ciardullo's arrest of her friend, Ms. Kantor stepped back.

27.     Ms. Kantor continued to film and question Defendants Long's and Ciardullo's arrest of her friend.

28.     Approximately two minutes after the officers tackled Ms. Kantor's friend to the ground, Defendant Claire Smith arrived on-scene. When Defendant Smith arrived, she ran directly to jump on the pile of Denver officers already smashing Ms. Kantor's friend on the ground. Defendants Long, Ciardullo, and Smith placed Ms. Kantor's friend into handcuffs.

29.     After placing Ms. Kantor's friend into handcuffs, Defendant Long yelled at Ms. Kantor to back up. Ms. Kantor responded with "yes sir" and *again* backed away from the officers.

30.     Despite the fact that Ms. Kantor had repeatedly complied with the officers' unlawful commands to back up, and was in no way interfering with their arrest of her friend, Defendant Long then pointed at Ms. Kantor and instructed Defendants Smith and Ciardullo to arrest her.

31.     Defendants Smith and Ciardullo, both heeding this direction from Defendant Long and independently deciding of their own accord, walked toward Ms. Kantor to arrest her.

32.     The first thing that Defendant Smith did as she approached Ms. Kantor was grab the phone out of her hand. Defendant Smith's first priority was ensuring that she stopped Ms. Kantor from recording.

33.     At this point, two other officers who had arrived on-scene, Defendants William Bartz and Thomas Bryson, also approached Ms. Kantor to arrest her, based both on the direction from Defendant Long and their own independent decision-making.

34.     Although Ms. Kantor had complied with the officers (illegal) orders, and was doing nothing even remotely disruptive or threatening, Defendants responded with dramatic

force. Defendants Smith and Ciardullo grabbed both of Ms. Kantor's arms, knocking her phone out of her hand and preventing her from continuing to film the interaction. Then, Defendants Bartz and Bryson grabbed Ms. Kantor's legs. Together, the four officers took Ms. Kantor to the ground and piled on top of her.

35.     There was no basis whatsoever for using force against Ms. Kantor. She was not fleeing. Ms. Kantor had not threatened any officer, or anyone else, with violence. She was unarmed. No reasonable person would believe that Ms. Kantor was going to destroy any property or commit any crime.

36.     Ms. Kantor was roughly handcuffed by Defendants Smith, Ciardullo, Bartz, and Bryson. Defendants searched her person without her consent. Defendant Smith then went through Ms. Kantor's phone and potentially deleted the video she had taken of the incident.

37.     Then, although she had done absolutely nothing wrong, Defendants transported Ms. Kantor to the Van Cise-Simonet Detention Center.

38.     At the detention center, Ms. Kantor was booked and placed in a cell. From her cell, Ms. Kantor could see the officers going through her purse. One officer pulled out her phone and was scrolling through it. Upon information and belief, either that officer, or Defendant Smith earlier, deleted the video Ms. Kantor had taken of the interaction. When Ms. Kantor received her phone back, the video she had taken was no longer on her phone.

39.     Defendants charged Ms. Kantor with interference. Defendants made false statements in their police reports.

40.     Defendant Smith wrote in her report that Ms. Kantor had come within less than an arm's reach of the officers, which was false. Defendant Smith wrote in her report that Ms. Kantor had attempted to take her friend's keys from him while Defendants had him on the

ground, which was also false. Defendant Smith also wrote in her report that Ms. Kantor attempted to run away from the officers when she was being arrested, which was false. Defendant Smith wrote that Ms. Kantor violently moved her body while the officers were arresting her, which was false.

41.     Defendant Ciardullo wrote in his report that Ms. Kantor came within three feet of the officers, which was false. Defendant Ciardullo wrote in his report that Ms. Kantor was asked to move back numerous times but refused, which was false.

42.     Defendant Long wrote in his report that Ms. Kantor came within three feet of the officers, which was false.  Defendant Long wrote in his report that Ms. Kantor ignored multiple commands to back away from the officers, which was false. Defendant Long wrote in his report that Ms. Kantor attempted to get the keys from her friend, which was false. Defendant Long wrote in his report that Ms. Kantor was intending to flee with her friend's truck, which was false.

43.     Ms. Kantor was subjected to almost two years of prosecution based on the false statements of Defendants Smith, Ciardullo, and Long. She was forced to miss work, hire a lawyer, and endure significant stress.

44.     Ms. Kantor went to trial on these baseless charges. A jury quickly recognized the falsity of Defendants' accusations against her, and acquitted her after less than ten minutes of deliberation.

45.     Defendants arrested Ms. Kantor because she was engaged in the constitutionally-protected conduct of filming, questioning their actions, and protesting their treatment of her friend. Had Ms. Kantor been standing there silently, and not filming, Defendants would not have arrested her.

**Defendant Denver abjectly failed to discipline the Individual Defendants for their unconstitutional conduct.**

46.     Defendant Denver has imposed no discipline on Individual Defendants for their unconstitutional actions against Ms. Kantor. Defendant Denver has not even conducted an investigation into its officers' clearly unconstitutional actions. Defendant Denver, through its inaction, has condoned the conduct of Individual Defendants.

47.     Defendant Denver did, however, "investigate" the use of force against Ms. Kantor's friend. Defendant Denver blindly accepted the Individual Defendants' false reports, condoned their use of excessive force, and imposed no discipline on the officers involved.

48.     The Individual Defendants knew prior to violating Ms. Kantor's constitutional rights that they would not be disciplined by Defendant Denver for their actions.

49.     Through its failure to supervise and discipline the Individual Defendants, Defendant Denver ratified their unconstitutional actions.

**<u>Defendant Denver is municipally liable for the Individual Defendants'</u>**
**<u>unconstitutional actions.</u>**

50.     All of the acts described herein were done by the Individual Defendants intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Ms. Kantor's federally protected rights, and were done pursuant to the preexisting and ongoing deliberately indifferent custom, policy, practice, training, and supervision of Defendant Denver acting under color of state law.

51.     The Individual Defendants' treatment of Ms. Kantor was pursuant to Defendant Denver's customs and/or practices of unlawful conduct, including but not limited to:

    a.  Stopping, detaining, arresting, citing, and prosecuting individuals for engaging in speech activity that is critical of Denver and law enforcement;

b.   Stopping, detaining, arresting, citing, and prosecuting individuals for recording police activity;

c.   Using force against individuals who exercise their free speech rights;

d.   Maliciously prosecuting individuals without probable cause and, particularly, engaging in malicious prosecutions in an attempt to cover-up police misconduct; and

e.   Failing to discipline officers, or even find officers have engaged in wrongdoing, in the face of obvious constitutional violations.

52.   Upon information and belief, Defendant Denver has provided no additional training to the Individual Defendants related to the incident with Ms. Kantor.

53.   The Individual Defendants' unlawful conduct, as set forth in detail herein, was in accordance with a custom and widespread practice instituted by Defendant Denver, even if not authorized by written law or express municipal policy, so permanent and well settled as to constitute a custom or usage with the force of law.

54.   Through its continuous ratification of unconstitutional detentions, arrests, prosecutions, excessive force, and stifling of free speech, Defendant Denver has condoned and ratified the conduct of the Individual Defendants.

55.   Defendant Denver failed to properly train and/or supervise its employees to avoid inhibiting free speech, the use of excessive force, unlawful seizure, and unlawful search.

56.   Defendant Denver knew, or should have known, that its employees would retaliate against Ms. Kantor for recording police activity and speaking critically of public officials thereby violating Ms. Kantor's constitutional rights.

57.     Defendant Denver was deliberately indifferent to Ms. Kantor's constitutional rights, because Defendant Denver knew that individuals in Ms. Kantor's position would be at a substantial risk of suffering dangerous consequences from Defendant Denver's failure to properly train and/or supervise its employees.

58.     Defendant Denver could have and should have pursued reasonable methods for the training and supervising of such employees but failed to do so.

59.     Defendant Denver's policies, customs, or practices in failing to properly train and/or supervise its employees were the moving force and proximate cause of the violation to Ms. Kantor's constitutional rights.

60.     The customs, policies, and practices of Defendant Denver of encouraging, condoning, tolerating, and ratifying the retaliation against those who criticize public officials, as described herein, was the moving force behind, and proximate cause of, the violation to Ms. Kantor's constitutional rights.

61.     The acts or omissions of Defendant Denver caused Ms. Kantor damages in that she suffered physical and mental pain, among other injuries, damages, and losses.

62.     The actions of Defendant Denver as described herein deprived Ms. Kantor of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused her other damages.

63.     The incident involving Ms. Kantor, standing alone, is sufficient evidence of these customs, policies and/or practices. Yet, there is more evidence of Defendant Denver's unconstitutional customs, policies, and/or practices.

**Defendant Denver has a custom and practice of retaliating against, arresting, and using excessive force against individuals in retaliation for their exercise of their First Amendment rights.**

64.     Defendant Denver has a history of retaliating against individuals who record and are critical of police officers—an issue that should have long since been addressed by Defendant Denver. The following cases show that at the time of Ms. Kantor's arrest, there was a formal or informal custom and practice, that was known to Defendant Denver, of retaliating against individuals who record and criticize police officers. These cases also illustrate an obvious need, of which Defendant Denver was aware at the time of Ms. Kantor's arrest, for Defendant Denver to provide further supervision, discipline, and training to its officers on the necessity of not retaliating against individuals who criticize and/or record police officers. Defendant Denver has also ratified and condoned this custom by failing to discipline its officers for arresting and individuals for criticizing and/or recording law enforcement.

65.     On August 14, 2014, Levi Frasier video-recorded Denver Police Department ("DPD") officers abusing an arrestee from a distance and at a public place. In response, the abusive DPD officers threatened him, took his video-recording device, and deleted the video from it. Luckily, Mr. Frasier was able to recover the video. He subsequently released it to the media.  Instead of thanking Mr. Frasier for coming forward to share information about the misconduct of its officers, the DPD released a statement defending its officers' behavior and unfairly attacking Mr. Frasier's character. Denver ratified its officers' actions in public. And, it never disciplined its officers for their illegal actions.

66.     On January 26, 2015, DPD officer threatened a witness who was attempting to file the aftermath of the DPD shooting of Jessica Hernandez. That witness tried to video-record the officers' actions in public while she was standing on her own property. DPD officers ordered her not to record. The DPD officers who engaged in this blatantly unconstitutional conduct were not disciplined in any way.

67.     On the morning of May 23, 2018, DPD officers arrested Elijah Wesbrock for using a video camera and mobile phone to record an office building of the Federal Bureau of Investigation from public sidewalks surrounding the building. After unlawfully arresting him, the DPD officers pushed Mr. Wesbrok against their vehicle and proceeded to illegally search him. After searching Mr. Wesbrock, they forced him into the back of their vehicle. DPD officers arrested and searched Mr. Wesbrock in retaliation for him recording public places.

68.     On July 5, 2018, Susan Greene was driving east on Colfax Avenue on her way to the bank when she saw a Black man, handcuffed and seated naked on the sidewalk across from the State Capitol Building. Several DPD officers stood around the man, who had no clothes on except a towel that covered his private parts. Concerned as both a public citizen and professional journalist, Ms. Greene parked her vehicle and crossed the street – by way of the crosswalk – onto the sidewalk nearby the scene. Ms. Greene stood on the public sidewalk and was not obstructing the police investigation. As Ms. Greene stood on the public sidewalk near the intersection of Colfax Avenue and Grant Street, out of the way of the officers, she took pictures of the scene with her iPhone. She was quickly stopped by one of the DPD officers who blocked her, got in her face, and told her to stop. Ms. Greene responded that it was a public sidewalk and that she had the right to take photos. The DPD officer told her that she did not. Ms. Green again asserted her First Amendment right to stand on the public sidewalk and take photos, without being in the way of the officers. Shortly thereafter, the DPD officer decided to arrest her. He grabbed Ms. Greene and twisted her arm backwards beyond its normal range of motion, to an excessive degree, causing Ms. Greene instant pain in her arm and shoulder. Another DPD officer then handcuffed Ms. Greene, tightly enough to leave clearly imprinted and red marks on her skin, and pushed her toward a nearby police car by grabbing her arm roughly and with a painful upward

thrust even though at no point did Ms. Greene resist being handcuffed. One of the officers then seized Ms. Greene's iPhone during her arrest. The officers put Ms. Greene – handcuffed – into a police car, where she sat for ten minutes before being released. During the encounter, one officer condescendingly told Ms. Greene that she should "act like a lady." Denver paid $50,000 to settle Ms. Greene's claims against it.

69.     On June 2, 2020, a DPD officer shot Darrell Hampton in the face with a pepper ball, during protests relating to the murder of George Floyd, because he was filming DPD officers' arbitrary deployment of chemical weapons and use of excessive force during those protests. Mr. Hampton was silently standing on a sidewalk near the Colorado Capitol when an officer riding on the side of a DPD vehicle raised his weapon and fired a pepper ball directly at Mr. Hampton's phone camera. There was no warning before the round was shot. Mr. Hampton's phone shattered on impact and the pepper ball exploded in his face. Denver has not disciplined the officer for shooting Mr. Hampton in the phone with a pepper ball.

70.     Several of these representative cases resulted in the Defendant Denver paying to settle First Amendment retaliation claims, yet the facts surrounding Ms. Kantor's case make apparent that Defendant Denver continues to condone such behavior by its police officers. This custom and practice caused the violation of Ms. Kantor's constitutional rights and Defendant Denver was on notice of this custom and practice based on these past incidents, which resulted in litigation and significant payouts by Defendant Denver at taxpayer expense.

71.     Through Defendant Denver's continuous ratification of its officers' unconstitutional conduct, as described above, Defendant Denver has condoned the conduct of its officers and sent the message that it will not discipline them for violating the Constitution.

72.     Defendant Denver knew or had constructive knowledge, based on the customary actions of its officers described above and its condoning of those actions, that its officers would retaliate against those who criticized and/or recorded the police, like Ms. Kantor.

73.     Defendant Denver could have and should have pursued reasonable methods for disciplining its officers to make clear that it does not condone such constitutional violations, but failed to do so.

74.     Defendant Denver's policies, customs, or practices in failing to properly train and supervise its employees were a moving force and proximate cause of their violation of Ms. Kantor's constitutional rights.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment Violation — Freedom Of Speech
### (Against All Defendants)

75.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

76.     Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

77.     Defendants are "persons" under 42 U.S.C. § 1983.

78.     Plaintiff was engaged in First Amendment-protected expression by both protesting police action and recording police officers in the performance of their official duties.

79.     The actions of Defendants can be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

80.      Plaintiff's expression was on a matter of public concern and did not violate any law.

81.      Plaintiff's expression occurred at a traditional public forum.

82.      Defendants' actions were a content-based and/or viewpoint-based restriction of Plaintiff's expression.

83.      Defendants' actions were not a reasonable time, place, and manner restriction on speech.

84.      At the time when Defendants stopped Plaintiff from speaking, expressing herself, and filming, Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to film, express herself, and speak freely. Any reasonable law enforcement officer knew or should have known of this clearly established right.[1]

85.      Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

86.      Defendants stopped Plaintiff from filming and engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Denver.

87.      Defendant Denver has a custom, practice or policy of tolerating violations of the First Amendment of the United States.

---

[1] At the time of this incident, the right to record police activity at public places is clearly established, both by state statute and the broad consensus of authority from other Circuits. *See, e.g.,* C.R.S. § 13-21-128; *Fields v. City of Phila.*, 2017 U.S. App. LEXIS 12159 (3d Cir. July 7, 2017); *Turner v. Lieutenant Driver*, 848 F.3d 678 (5th Cir. 2017); *Bowens v. Superintendent of Miami S. Beach Police Dep't*, 557 Fed. App'x 857, 863 (11th Cir. 2014); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Ci r. 2000); *Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014); *Adkins v. Limtiaco*, 537 Fed. App'x 721, 722 (9th Cir. 2013); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 599–600 (7th Cir. 2012); *Glik v. Cunniffe*, 655 F.3d 78, 79 (1st Cir. 2011); *Iacobucci v. Boulter*, 193 F.3d 14, 25 (1st Cir. 1999); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995).

88.     The actions of the Individual Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver.

89.     Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

90.     As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

91.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after her arrest, and other compensatory and special damages.

92.     Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment Violation — Retaliation
### (Against All Defendants)

93.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

94.     Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

95.     Defendants are "persons" under 42 U.S.C. § 1983.

96.     Plaintiff was engaged in First Amendment-protected expression by questioning, opposing, and filing the conduct of Defendant officers.

97.     Plaintiff's expression was on a matter of public concern and did not violate any law.

98.     Plaintiff's expression occurred at a traditional public forum.

99.     Defendants jointly and on their own accord responded to Plaintiff's First Amendment protected activity with retaliation.

100.    Defendants' actions against Plaintiff were a content- and/or viewpoint-based restriction on speech.

101.    Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in such First Amendment protected activity.

102.    Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of her First Amendment rights.

103.    At the time when Defendants retaliated against Plaintiff for exercising her First Amendment rights, Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to be free from retaliation. Any reasonable law enforcement officer knew or should have known of this clearly established right.

104.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

105.    Defendants stopped Plaintiff from engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Denver.

106.    Defendant Denver has a custom, practice or policy of tolerating its officers' retaliatory violations of the First Amendment of the United States and Colorado Constitutions.

107.    The actions of Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver.

108.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

109.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

110.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered, and other compensatory and special damages.

111.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourth Amendment Violation — Unlawful Arrest
### (Against All Defendants)

112.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

113.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

114.    Defendants are "persons" under 42 U.S.C. § 1983.

115.    Defendants did not have probable cause or any other legal basis to believe that Plaintiff had committed or was committing any violating of the law prior to directing Plaintiff to step back and arresting her.

116.    Defendants had no warrant authorizing them to contact Plaintiff.

117.    Defendants who did not personally detain or arrest Plaintiff failed to intervene to prevent the other Defendants from searching Plaintiff without a warrant, probable cause, or exigent circumstances.

118.    No legally recognizable exigent circumstances existed which would have justified or permitted Defendants' conduct.

119.    Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

120.    Defendants' intentional, willful, and wanton seizure of Plaintiff, as described herein, was solely based on Plaintiff's exercise of her First Amendment rights.

121.    Defendant Denver has a custom, practice or policy of tolerating violations of the Fourth Amendment of the United States Constitution.

122.    Defendant Denver's customs, policies, and/or practices were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

123.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered, and other compensatory and special damages.

124.     Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourth Amendment Violation — Unlawful Search**
**(Against All Defendants)**

125.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

126.     Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

127.     Defendants are "persons" under 42 U.S.C. § 1983.

128.     Plaintiff has a legitimate expectation of privacy in her body and her property being free from unreasonable governmental search.

129.     Defendants had no warrant authorizing any such search of Plaintiff's body or property.

130.     No legally recognizable exigent circumstances or other legal justification existed which would have justified or permitted Defendants' conduct.

131.     Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

132.     Defendants who did not personally search Plaintiff failed to intervene to prevent the other Defendants from searching Plaintiff without reasonable suspicion, a warrant, or exigent circumstances.

133.     Defendants engaged in these actions intentionally, willfully, and wantonly.

134.     Defendant Denver has a custom, practice or policy of tolerating violations of the Fourth Amendment of the United States Constitution.

135.     Defendant Denver's customs, policies, and/or practices were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

136.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered, and other compensatory and special damages.

137.     Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourth Amendment Violation — Malicious Prosecution**
**(Against Defendants Smith, Ciardullo, and Long)**

138.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

139.     Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

140.     Defendants are "persons" under 42 U.S.C. § 1983.

141.     Defendants initiated charges against Plaintiff knowing that there was no basis for those charges or probable cause to believe Plaintiff had committed any crime.

142.     No probable cause supported Plaintiff's original arrest, confinement, or prosecution.

143.     Defendants' motivation was not to bring to justice a person thought to have committed a crime, but rather for the purpose of punishing Plaintiff and covering up their unlawful conduct.

144.     Defendants acted with malice in initiating the charges against Plaintiff and her continued prosecution.

145.     Defendants engaged in the above actions and omissions knowingly, maliciously, willfully and wantonly.

146.     Defendants who did not personally initiate the malicious prosecution of Plaintiff failed to intervene to prevent the other Defendants from doing so.

147.     Defendants' conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in their positions knew or should have known.

148.     The charges against Plaintiff resulting from the actions/omissions of Defendants described herein were dismissed; thus, the original action against Plaintiff terminated in her favor.

149.     Defendants' actions caused Plaintiff damages. As a legal and proximate result of Defendants' actions or omissions described herein, including the unconstitutional custom, policy, or practice of making arrests without probable cause described above from which this malicious prosecution claim arises, Plaintiff has suffered and continues to suffer humiliation, lost earnings, emotional distress, loss of enjoyment of life, and other significant injuries, damages and losses.

150.     Defendant Denver has a custom, practice, or policy of tolerating violations of the Fourth Amendment of the United States Constitution, particularly condoning malicious prosecutions initiated by police officers without probable cause.

151.     Defendant Denver's customs, policies, and/or practices were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

### SIXTH CLAIM FOR RELIEF
### 42 U.S.C. § 2000aa
### Privacy Protection Act
### (Against All Defendants)

152.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

153.     While arresting Plaintiff, Defendants seized Plaintiff's camera. After seizing her camera, Defendants destroyed her video recording of the incident.

154.     Plaintiff had a purpose to disseminate the video recording she took of Defendants' actions.

155.     Plaintiff planned to disseminates her recording online thereby making the dissemination of the recording to involve and affect interstate commerce.

156.     There was no reason to believe that the immediate seizure of Plaintiff's camera was necessary to prevent the death of, or serious injury to, a human being.

157.     There was no reason to believe that the destruction of Plaintiff's recording was necessary to prevent the death of, or serious injury to, a human being.

158.     As a direct and proximate result of Defendants' seizure of Plaintiff's camera, Plaintiff suffered damages.

### SEVENTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourth Amendment Violation — Excessive Force
### (Against All Defendants)

159.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

160.     Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

161.     Defendants are "persons" under 42 U.S.C. § 1983.

162.     Plaintiff had a protected Fourth Amendment interest against being victimized by the use of excessive force at the hands of law enforcement personnel.

163.     Defendants did not have, at any time, a legally valid basis to seize Plaintiff.

164.     Defendants unlawfully seized Plaintiff by means of excessive physical force.

165.     Defendants had no warrant authorizing any seizure of Plaintiff.

166.     Each Defendant failed to intervene to prevent the other Defendants from violating Plaintiff's constitutional rights, and is thereby liable for such failure to intervene.

167.     Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

168.     Plaintiff had committed no crime (nor could any of the Defendants have reasonably believed she had committed any crime) that would legally justify arrest or detention, Plaintiff gave Defendants no reason to fear for their safety or the safety of any member of the public. Plaintiff was obviously unarmed, and Plaintiff was not resisting arrest or fleeing.

169.     Defendants did not have a legally valid basis to seize Plaintiff in the manner and/or with the level of force used under the circumstances presented.

170.     Defendants recklessly created the situation in which they used force.

171.     Defendants' actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them.

172.     At the time when Defendants used excessive force against Plaintiff, Plaintiff had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure from unreasonable seizure through excessive force. Any reasonable law enforcement officer knew or should have known of this clearly established right.

173.     Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally-protected rights.

174.     Defendant Denver has a custom, practice or policy of tolerating violations of the Fourth Amendment of the United States Constitution.

175.     The actions of Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver.

176.     Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

177.     As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described herein, Plaintiff suffered injuries, damages, and losses.

178.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered, and other compensatory and special damages.

179.     Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against each Defendant, and award her all relief allowed by law, including but not limited to the following:

A.     All appropriate relief at law and equity;

B.     Declaratory relief and other appropriate equitable relief;

C.     Economic losses on all claims as allowed by law;

D.     Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

E.     Punitive damages on all claims allowed by law and in an amount to be determined at trial;

F.     Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

G.     Pre-and post-judgment interest at the lawful rate; and

H.     Any other appropriate relief at law and equity that this Court deems just and proper.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this 14th day of July 2021.

KILLMER, LANE & NEWMAN, LLP

*/s/ Andy McNulty*
Andy McNulty
Mari Newman
1543 Champa St., Ste. 400
Denver, CO 80202
Phone: (303) 571-1000

27

Facsimile: (303) 571-1001
amcnulty@kln-law.com
mnewman@kln-law.com

COUNSEL FOR PLAINTIFF